OPINION OF THE COURT
Edward M. Horey, J.
The motion at bar is brought on underlying facts which disclose that the plaintiff bank initially issued Visa credit cards to the defendants in 1972. After numerous financial transactions dealing with the use of various Visa credit cards issued intermittently on a two-year term basis, the defendant husband and wife separated in the spring of 1978. They have lived separate and apart since that date. In 1982 upon the failure of the defendant Claire E. Lindauer to make payment, the plaintiff brought an action against both defendants for the balance allegedly due by both defendants’ use of the credit cards issued. Only the defendant husband, Claire E. Lindauer, was served with the summons and complaint at that time.
A judgment by default was subsequently taken against the defendant Claire Lindauer on December 21, 1982 in the amount of $4,155.38. The defendant Bonalyn Lindauer was not served with the summons and complaint until July 22, 1986. The answer of that defendant now consists of a general denial and the specific affirmative defense of the Statute of Limitations. The plaintiff bank now moves for summary judgment against the defendant, Bonalyn Lindauer.
The instant motion deals with the use of a "credit card”, in particular the use of a credit card by a husband and wife not only during their marriage but also following their separation.
At the outset this court is compelled to confess that it is amazed at the dearth of law not only generally but particularly in the State of New York on the subject matter of credit cards and their use. A review as detailed as this court could make, inclusive of the employment of computer science, discloses that there are less than 10 cases of reported decisions in this State which even mention the word "credit card”. This poverty of prior judicial precedence takes on significance when *134 it is considered that millions of transactions annually employ the use of a credit card as a means of purchase or finance and further significance when it is considered that the use of each separate credit card is governed by particular provisions formulated by the particular issuer of the credit card involved.
The General Business Law of this State seeks to define the term credit card as follows: " 'Credit card’ means and includes any credit card, credit plate, charge plate, courtesy card, or other identification card or device issued by a person to another person which may be used to obtain a cash advance or a loan or credit or to purchase or lease property or services on the credit of the issuer or of the holder” (General Business Law § 511 [1]). The statute also defines terms of "person”, "issuer”, "holder”, "unauthorized use”, "seller”, "lender”, "improper use”, and "accepted credit card”. However, the statute fails completely in disclosing the nature of the use of a credit card from a legal standpoint. The broad spectrum of seeking to define the use of a credit card from such a viewpoint is summarized in 50 Am Jur 2d, Letters of Credit, and Credit Cards, § 38, at 428-429, as follows: "From a legal standpoint, credit cards or their predecessors have been variously defined as, or held to be, negotiable instruments, mere identification cards, broad contracts of guaranty, assignments, third-party beneficiary contracts, or special, clean, revocable letters of credit.” (Case reference is set forth for each definition noted.)
In the opinion of this court the starting point in giving legal consideration to the use of a credit card is that area of the law generally referred to as "contracts”. For as the instant case demonstrates the issuance and use of a credit card creates a legally binding agreement with an attending obligation to do or not to do a particular thing. As in any contractual relation there must be mutuality of agreement and obligation, legal and valid consideration, and competent parties.
Because the use of a credit card creates an assurance of payment upon the performance of certain conditions and provides a means by which a person whose own promise to make a payment might be of dubious value, the ability to obtain the benefit of a richer reputation, a stronger credit which will produce the desired action, it is closely allied in legal concept to a letter of credit. This is especially true since a letter of credit contractually always serves as a guarantee. (See, Harfield, Code Treatment of Letters of Credit, 48 Cornell LQ 92, 92-93.)
*135 As Mr. Harfield cogently notes in explanation of letters of credit: "Basic to any consideration of the nature of letters of credit is to realize that they are financial instruments. They are not negotiable instruments, but they are instruments which contemplate the payment of money. While they are of enormous utility in facilitating trade and facilitating the movement of goods, they are financial instruments and not mercantile instruments.” (48 Cornell LQ, op. cit., at 93.)
One of the very few reviews of credit cards is to be found in 35 Notre Dame Lawyer 225. In an extremely well-written, thoughtful, analytical and well-documented article, the author, John R. Martzell, deals with the use of credit cards, as well as reviewing the variety of types of such cards. It is the thesis of that article that credit cards are "special, clean, revocable letters of credit”. In making this definition the author explains that: "[a] 'clean’ letter of credit is one which may be accepted by the creditor without shipping documents. This letter of credit may be revocable at the will of the writer if so provided in the contract and at the very least it is of limited duration.” He further explains: "Where the contract so provides, a letter of credit is non-assignable and it binds the writer only to the party to whom it is addressed. This makes a letter of credit a 'special’ letter of credit.” (35 Notre Dame Law, at 226-227.)
While this court is reasonably satisfied that a letter of credit is the legal instrumentality most analogous to a credit card in its use, the court nonetheless concedes that there may be subtle differences. For example, a letter of credit appears to be employed generally for a particular financial transaction, whereas a credit card is employed on multiple financial transactions. We can only leave for appellate determination the refinement of differences between a letter of credit and a credit card.
This court find itself imitating the medical profession which typically upon the discovery of a new disease, gives it a name, because it makes it easier to talk about it. The court pursues its analysis of use of a credit card for that reason and the additional reason that "pigeonholing” is important in examining the legal rights and duties inhering in the letter of credit which are both similar to the contractual rights and duties of credit card systems and thus useful in placing burdens, where in good conscience, it seems they should lie.
In its review the Notre Dame Lawyer (op. cit., at 228) notes *136 six similarities between credit cards and letters of credit as follows:
"LETTER OF CREDIT
"1) Request made by party for a letter of credit.
"2) If granted, a letter is sent to the creditor bank or business which sets out the terms of extending the credit.
"3) Beneficiary presents letter of credit at creditor establishment and draws drafts or receives merchandise on the strength of the letter of credit.
"4) Creditor looks to the writer of letter for payment for credit given to beneficiary.
"5) Writer looks to beneficiary for reimbursement.
"6) By the terms of the letter, it may be revocable.”
"CREDIT CARD
"1) Application sent to issuer along with credit references.
"2) If granted, the credit card is given to the user. There is already a written contract between issuer and creditor setting out the terms of credit extension.
"3) User presents card to creditor and buys goods or services on credit.
"4) Creditor discounts the check or charge slip with the issuer.
"5) Issuer bills the user for the face amount of the check or charge slip.
"6) Credit cards may be revoked at any time at the discretion of the issuer.”
It is sufficient for the present motion to note and stress the fact that both a letter of credit and a credit card are embodied in a contractual relation and each has the aspect of guarantee of payment.
Central to a determination of the motion at bar is a consideration of the issuance of a credit card, the parties to such issuance, the effective period of the credit card and the renewal of a credit card.
In the instant case, Claire E. Lindauer and Bonalyn Lindauer, his wife, first signed an "Empire Credit Application and Agreement” on or about August 15, 1972. This application was signed by Claire E. Lindauer as "Borrower”. It was signed by his wife, Bonalyn Lindauer, as "Co-Borrower”. The amount of credit requested was $500.
*137 The application of Mr. and Mrs. Lindauer was approved by the plaintiff bank. A Visa account was opened by the bank in the name of the Lindauers on or about August 22, 1972. Visa credit cards were issued to the Lindauers and a copy of the Visa card agreement was mailed with the cards.
Six years later and on or about May 9, 1978 Mr. and Mrs. Lindauer requested an increase in the amount of credit from $500 to $800. Again they signed an "Empire Credit Application and Agreement”. Again the application was signed by Claire E. Lindauer as "Borrower” and by Bonalyn Lindauer as "Co-Borrower”.
It is conceded by the plaintiff bank that the requested increase in credit from $500 to $800 was approved in 1978. It does not appear whether new Visa cards were issued at that time.
Thirteen separate provisions were set forth in the application forms which the Lindauers twice signed — once in 1972 and again in 1978. Relevant here are terms of provision No. 12. It recited: "If this application is signed by a co-borrower, borrower and such co-borrower shall be jointly and severally liable for all obligations hereunder, and all references here-into the rights or obligations of borrower shall apply to borrower and co-borrower. Co-borrower may obtain Empire Credit hereunder in the manner provided in paragraph 1 hereof and the signature of either borrower or co-borrower on any check shall authorize credit as herein provided.” (Italics added.)
The practice of the plaintiff bank concerning issuance and reissuance of Visa credit cards is set forth in the affidavit of D. W. Readett, assistant vice-president, sworn to September 9, 1986, viz.: "Each Visa credit card issued by M & T is valid for a period of two years from the last day of the month in which the Visa credit card was issued. It is M & T’s practice to reissue a Visa credit card prior to the time the older Visa credit card expires. Included with each Visa credit card reissued by M & T is the current Visa Card Agreement. The terms and conditions of each Visa Card Agreement becomes effective upon the use of the Visa credit card by a cardholder or a person authorized by the cardholder.” (Italics added.)
While the stated provision referable to the act which will trigger the effectiveness of the credit card, viz., the first use thereof is readily found in a paragraph on page 3 of the terms of credit agreement in a paragraph entitled, "When This *138 Agreement Becomes Effective”, the same is not true of the vice-president’s statement referable to duration of validity of the card.
A careful scrutiny of the terms of the credit agreement discloses no provision that states that a credit card when issued is valid for a period of two years. Nonetheless, there is a broad provision in reference to duration of the credit card. It is found on page 3 of the credit agreement in a paragraph entitled "Cancellation”. There it is stated, "We can cancel your account at any time”. Employment of this provision would provide the contractual basis for the adopted practice of the bank in limiting the validity of its credit cards for a two-year period. The court notes that there is no two-year delimiting period of validity to be found in the terms of the application for the credit card, nor does the application contain any broad term which would support such delimiting action.
This court accepts the fact that a credit card when issued by the plaintiff bank was effective only for a two-year period measured from the last day of the month in which it was issued.
Since the original credit card was issued on August 12, 1972 that card would have been valid only until August 31, 1974. At that time according to the practice of the plaintiff bank, new credit cards would have been required to be reissued to both Mr. and Mrs. Lindauer. Similarly, new cards would have been required on August 31, 1976 and August 31, 1978, upon the expiration at each date of the previous credit card which was valid for only a two-year period.
The court pauses at this point to touch upon a term critical to the decision of the motion at bar. It is the joint liability of the defendant Bonalyn Lindauer for indebtedness incurred by her husband, Claire E. Lindauer, which the plaintiff bank so vehemently and positively asserts to be applicable.
The nature of joint, several, and joint and several liability are called to mind. In 2 Williston, Contracts § 316, at 540 (3d ed 1961) it is pointedly stated: "When several parties enter into a contract to perform the same act they may bind themselves to do so jointly in which case they are bound as though they were a single person; or, each may bind himself as a separate individual or, they may bind themselves jointly and severally.”
Continuing, Professor Williston states (§ 316, at 541-542), in amplification of several liability, the following: "Each promi *139 sor may contract separately to render a separate performance or each may make a separate promise that he will perform the same act. Under these circumstances each is bound severally for the performance which he promises and is not bound jointly with anyone else. ” (Emphasis added.)
The most detailed search for terms which would bind Mr. and Mrs. Lindauer to an obligation of joint liability for indebtedness discloses that it is found only in provision No. 12 of the application form hereinbefore quoted. There is no counterprovision found in the terms of the credit agreement. Yet it is only the terms of the credit agreement which are renewed at the elapse of each two-year period. Such terms contained in the credit agreement accompany each new credit card issued after the elapse of a two-year period and contain the provision that the use of the card thereafter will trigger the terms and make the same contractually applicable to the borrower.
Nothing is more important than to ask "What happened on a renewal to the terms in the application form in particular the terms which imposed joint and several liability on the borrower?” The answer is clear. Those provisions terminated at the conclusion of the two-year period when the plaintiff bank opted to terminate the validity of the preexisting contract. With the exception of the year 1978 which will be dealt with separately hereafter, no provisions contained in the application form of 1972 were embodied in the credit contract of the plaintiff and the defendants in the year 1974 and 1976. This is for the reason that no new application form was completed by the defendants in those years. No authority is needed to support the fundamental proposition that a party is not bound contractually to provisions which are not contained in the contract. In sum, the initial contract included the provision in the application form and those in the credit agreement. The renewal contracts contained only the latter. Any doubt on this critical point is resolved under the very terms of the bank’s credit agreement. It provides under a paragraph entitled, "Entire Agreement”, as follows: "This agreement is the final and complete agreement between you and us concerning your account and replaces any earlier agreement between you and us concerning your account. ” (Italics added.)
Thus, the court holds that the defendants by signing the application form in August 1972 were bound to joint and several liability until August 31, 1974 because of the inclusion in their contract of provision 12 in the application form. From *140 August 31, 1974 to August 31, 1976 and from August 31, 1976 to May 9, 1978, their liability was several only. This is for the reason that their contractual duties were embraced in only the terms of the credit agreement and did not include the terms in the application form.
However, in the sequence of renewal of validity of the original credit card each two years a special circumstance intervened. On May 9, 1978 the defendants, Mr. and Mrs. Lindauer, executed a new and second application form for credit. This application sought credit in the amount of $800. The plaintiff bank approved the application of Mr. and Mrs. Lindauer for this amount. Including as it did the provision of No. 12 Mr. and Mrs. Lindauer again became subject to the provision for joint and several liability contained in the May 1978 application form. The terms of the immediate preexisting contract consisting of only the provisions of the credit agreement were replaced by the terms of a new contractual agreement. The new agreement of May 1978 like the original agreement of August 1972 consisted of the terms set forth in the application for the credit card made in May of 1978 and in the terms of the credit agreement as well.
It does not appear whether or not the plaintiff bank issued new Visa cards to Mr. and Mrs. Lindauer upon its approval of their May 1978 application for increased credit. However, it is clear from the opening paragraph of the application form that if the application was accepted and approved, it was the obligation of the bank to issue the credit cards applied for. Whether the bank issued new credit cards or whether it merely permitted Mr. and Mrs. Lindauer to use the credit cards then existing is not important. What is important is that the terms which applied to the use of a credit card after the bank’s approval of the new application of May 9, 1978 were those terms and conditions contained in that application form and the terms of the credit card agreement in effect on May 9, 1978. As this court pointedly notes those terms were not only a modification of the immediate prior agreement as to the amount of credit but also the resurrection and inclusion of the terms of the application form which included provision for joint and several liability.
It is certainly determined that a modification of a contract results in the establishment of a new agreement between the parties which pro tanto supplants the affected provisions of the original agreement while leaving the balance of it in tact. (Beacon Term. Corp. v Chemprene, Inc., 75 AD2d 350, 354 [2d *141 Dept 1980].) Citing as authority among others Becker v Faber (280 NY 146); Walker v Millard (29 NY 375); Radist v Zidel (12 AD2d 648) and 6 Corbin, Contracts § 1293.
It is important to note that a new period of validity came into existence for whatever credit card evidenced the new May 1978 agreement of the parties and this whether it was a new card or an existing card. That new period of validity under the stated two-year practice of validity of the plaintiff bank would have commenced May 31, 1978 and expired May 31, 1980.
From the facts presented it is clear that after May 31, 1980 the defendant Bonalyn E. Lindauer signed no other form for application for credit. Neither did she use any credit card for credit after that date. She and her husband were separated at that time. Any indebtedness that was incurred on or after May 31, 1980 was the result of action taken solely by her husband, Claire E. Lindauer.
This court holds that any contractual relationship between the plaintiff bank and the defendant, Bonalyn Lindauer, terminated on May 31, 1980 when the extension of credit to her terminated under the custom and practice of the plaintiff bank. From that date on, her liability to the bank for indebtedness in any event would have been a several one only as a consequence of her use of a credit card and with only the provisions of the credit agreement applicable to such indebtedness.
Having incurred no independent indebtedness by use of any credit card and having signed no agreement to be bound by any contractual provision for joint liability with her husband after May 31, 1980, and the prior contract imposing joint liability on her having terminated, this court holds there is absent any legal basis for imposing liability upon her for indebtedness incurred after May 31, 1980. Applicable to the holding made is the statement in 10 Williston, Contracts § 1213A (3d ed 1961): "The card holder, as guarantor, is entitled to have his undertaking strictly construed.” Application of the principle of strict construction is found in Socony Mobil Oil Co. v Greif (10 AD2d 119 [3d Dept I960]) wherein the plaintiff had issued the husband two credit cards, one of which he gave to his wife. Thereafter, the husband surrendered his credit card and advised the plaintiff of marital difficulties. The wife’s continued use of the credit card was held not to impose liability upon her husband. The decision *142 was founded on the absence of any contract provision providing that both credit cards had to be surrendered. The court refused to imply such a condition. As the author of the contract and its provisions it is wholly proper to construe the same most strictly against the creditor bank.
The court turns now to the question of application of the Statute of Limitations.
It does not appear from the facts presented what the precise amount of indebtedness was outstanding as of May 31, 1980 although by inference it was substantially in excess of $800. The facts do disclose that after May 31, 1980 the husband, Claire E. Lindauer, created substantial additional indebtedness reaching a high of $3,801.50, on or about January 15, 1982. Interim payments on indebtedness were made by the husband after May 31, 1980 until May 24, 1982.
When indebtedness reached $3,801.50, the plaintiff demanded the entire balance be paid. It was not paid. The defendant husband was ultimately sued by the plaintiff on November 17, 1982 and a judgment for the unpaid credit balance together with interest and attorneys’ fees was taken against him by default on December 21, 1982 for a total sum of $4,155.38.
The court turns to the first argument advanced by the plaintiff for liability of the defendant, Bonalyn Lindauer. Here, the plaintiff notes that when it commenced its action for recovery, it named as parties defendant both Claire Lindauer and Bonalyn Lindauer. Service was effected on Claire Lindauer on November 17, 1982. It is conceded that service of the summons and complaint were never effected on Bonalyn Lindauer until July 22, 1986. Since service was obtained against Claire Lindauer, it is argued that such service tolled the Statute of Limitations against Bonalyn Lindauer. Since judgment obtained against Claire Lindauer has not been satisfied it is further argued that the action may continue now to obtain a judgment against Bonalyn Lindauer.
Such argument brings into play the provisions of CPLR 203 and those of CPLR 1502.
CPLR 203 deals with the computation of time referable to the application of the Statute of Limitations. CPLR 203 (b) provides in relevant part:
"A claim asserted in the complaint is interposed against the defendant or a co-defendant united in interest with him when:
*143 "1. the summons is served upon the defendant” (italics added).
CPLR 1502 deals with defenses in subsequent actions against coobligors. It provides as follows: "A subsequent action against a co-obligor who was not summoned in the original action must be maintained in order to procure a judgment enforceable against his individually held property for the sum remaining unpaid upon the original judgment, and such action shall be regarded as based upon the same obligation contract or liability as the original judgment for the purpose of obtaining any provisional remedy * * * The defendant in the subsequent action may raise any defenses or counterclaims that he might have raised in the original action if the summons had been served on him when it was first served on a co-obligor, and may raise objections to the original judgment, and defenses or counterclaims that have arisen since it was entered. ” (Italics added.)
The interrelation of the provisions of CPLR 203 and 1502 and their application to particular factual situations is not unlike playing chess without a board.
1 Weinstein-Korn-Miller, NY Civ Prac ¶ 203.06, at 2-94 states that the term united in interest "has not proven easy to apply”. Professor Siegel in his NY Prac § 45 says that the "test of what interests are 'united’ under this provision is pragmatic.”
The application of the provisions of CPLR 203 and 1502 are especially complicated in the case at bar for the reason that the two defendants were liable for some of the indebtedness incurred jointly and severally and for some severally only. The court recalls at this time that by dint of provision 12 in the application form the defendants were liable for indebtedness from August 30, 1972 to August 30, 1974 jointly and severally. Because of the absence of provision 12 of the application form from August 30, 1972 to May 31, 1978, they were liable for indebtedness severally only. From May 31, 1978 to May 31, 1980 they were again liable for indebtedness jointly and severally. After May 31, 1980 again because of the absence of provision 12 in the application form they were only severally liable for any indebtedness incurred.
What CPLR 203 and 1502 together provide is that the defense of the Statute of Limitations is not available in a later action against a defendant named but not served in the first action if such unserved defendant was "united in interest” with the defendant that was served. *144 The meaning of the phrase "united in interest” in CPLR 203 has been dealt with in detail in a series of three opinions by Justice Damiani. (See, in particular, Connell v Hayden, 83 AD2d 30, 40-42 [2d Dept 1981]; Brock v Bua, 83 AD2d 61 [2d Dept 1981]; Paciello v Patel, 83 AD2d 73 [2d Dept 1981].) We are indebted to Justice Damiani for his diligence and the thoroughness of his review. In his review Justice Damiani speaking for the Second Department has stated that: "[a] rule has evolved that where one defendant 'may’ have a defense which is not available to the other, they cannot be said to be united in interest * * * [t]he mere possibility that a defendant who was served late could have such a different defense is all that is required because, the statute having run, it is now too late for him to conduct an investigation into the viability of that defense. To determine unity of interest, therefore, one looks not to whether the two defendants will assert different defenses but rather whether they could assert such different defenses.” (Connell v Hayden, 83 AD2d, at 1-2.)
As applied to the case at bar it is clear that when her husband was sued the defendant Bonalyn Lindauer had available different defenses than that of her husband. For example, had she been served when her husband was served, she could have asserted the defense of the Statute of Limitations to any portion of the collective indebtedness incurred by her severally more than six years prior to the commencement of the action. Since her husband incurred indebtedness severally at times different than did Bonalyn, he would have had the defense of the statute to different portions of the collective indebtedness. This is extremely important because it appears that Bonalyn Lindauer incurred very little indebtedness and that very infrequently.
What the plaintiff has done in the instant case is to transmogrify (a) claims for indebtedness owed severally by the two defendants with (b) claims for indebtedness owed jointly and severally by the two defendants into one amalgamated claim of indebtedness against either or both.
In addition to the differing defenses of Statute of Limitations available to the two defendants when the initial action was brought against Claire E. Lindauer there is an additional defense of the Statute of Limitations which has accrued to the defendant Bonalyn Lindauer since the judgment was entered against her husband in 1982. This is a defense as to each indebtedness that has existed for more than six years prior to *145 the institution of the second action brought against Bonalyn Lindauer in 1986.
The last three lines of CPLR 1502 provide that a defendant named but not served in the first action "may raise objections to the original judgment, and defenses or counterclaims that have arisen since it was entered. ” (Italics added.) Read literally this means that the defendant wife may raise the Statute of Limitations as a defense to any indebtedness incurred six years prior to the date of the second action which commenced July 22, 1986, although it was not available as a defense at the time the first judgment was entered in 1982. In sum Bonalyn Lindauer can raise the defense of the Statute of Limitations against any claim of indebtedness incurred before July 22, 1980. (See, First Natl. City Bank v Cervera, 43 Misc 2d 843, 845.) The defendant Bonalyn Lindauer has raised the Statute of Limitations as a defense. Since the last possible date for incurring liability terminated as to Bonalyn Lindauer on May 30, 1980, for all of the reasons noted, this court holds that the defense of the Statute of Limitations is an available and valid defense to her in the action brought against her.
The plaintiff advances a second argument for liability on the part of the defendant wife. It contends that the payments made by the defendant husband after May 30, 1980 and up until suit was commenced against him on November 17, 1982 tolled the Statute of Limitations not only as to that defendant but as to his wife, Bonalyn Lindauer. On this argument the plaintiff is wholly in error. "It is well settled that a payment in case of a joint liability by one does not extend the statute [of Limitations] as to others jointly liable.” (Peoples Trust Co. v O’Neil, 273 NY 312, 315, citing additional cases and Williston, Contracts; State Bank v Mangan, 240 App Div 327 [3d Dept 1934]; see also, 2 Carmody-Wait 2d, NY Prac § 13:279.) The court holds that payments made by the defendant Claire E. Lindauer after May 31, 1980 on the credit card indebtedness did not extend the Statute of Limitations as to the defendant Bonalyn Lindauer as a joint debtor.
The court finds a further defense to the motion for summary judgment in the provisions which relate to notice to the defendants.
Under paragraph f of the credit agreement entitled, "Your Maximum Credit Line”, it is stated: "We do not have to tell you if we raise it (i.e., the credit line). You will not at any *146 time allow the total purchases and loans to exceed your maximum credit line, if it does you will immediately pay us the excess.”
In the opinion of this court the recited paragraph imposes a condition on the defendants as borrowers which is impossible of performance. If the plaintiff bank opts to ex parte raise the credit line and further opts to not so advise the borrowers of that fact, how under any legal concept can the borrowers be expected to comply with the provision that they not exceed the unknown ceiling?
Under such circumstances notice is required as a condition implied in fact. Professor Williston advises that the basic rule here was laid down long ago in the English case of Vyse v Wakefield (6 M & W 442). There it was stated: "The rule to be collected from the cases seems to be this, that where a party stipulates to do a certain thing in a certain specific event which may become known to him, or with which he can make himself acquainted, he is not entitled to any notice, unless he stipulates for it; but when it is to do a thing which lies within the peculiar knowledge of the opposite party, then notice ought to be given him.” (Vyse v Wakefield, 6 M & W 442, 452-453; 6 Williston, Contracts § 887BB, at 526, n 5 [3d ed 1961].)
Further, the quoted provision providing for secrecy, i.e., the right to increase credit limit without notice, is contradictory of other terms of the credit agreement which obligated the bank to give notice.
That paragraph of the credit agreement entitled "changes” provided in relevant part: "Any change in this agreement must be in writing. We can change this agreement at any time. We will send or deliver to you notice of the change and its effective date. The change may apply to all or part of the balance of your account when the change takes place.” (Italics added.)
The noted conflicting provisions for notice are particularly relevant in the case at bar. At the time the defendant, Bonalyn Lindauer, separated from her husband in 1978 and moved to Pennsylvania, the maximum credit line which was permitted by the plaintiff bank was $800. It is the uncontested proof of Bonalyn Lindauer that she never received any notifications from the plaintiff bank other than the credit agreements issued each two-year period.
Pursuing her life separately from her husband in Pennsylvania aware only upon her departure that the maximum credit was limited to $800, she was totally unaware that the *147 joint action of the bank and her husband increased the credit line to a maximum of $3,801.50.
The court holds that under the terms of the credit agreement the defendant, Bonalyn Lindauer, was entitled to notice of any increase in credit over $800. It holds further the failure of the bank to give such notice was a default in a material condition of the contract with her and supplies a separate defense to the plaintiffs motion for summary judgment. (See, 6 Williston, Contracts § 887BB, at 527-528 [3d ed 1961].)