DeMOSS, Circuit Judge:
Under a Master Netting, Setoff, and Security Agreement (“Netting Agreement”), Reliant Energy Services, Inc. (“RES”) and Reliant Energy Services Canada, Ltd. (“RESC”) (collectively, “Reliant” or “Reliant Parties”) sought $78,468,996.60 from Enron Canada Corporation (“Enron Canada”). Reliant filed a breach of contract claim in federal court against Enron Canada seeking a declaratory judgment that the terms of the Netting Agreement made Enron Canada jointly liable for $78,468,996.60 and an injunction requiring Enron Canada to pay this amount into the registry of the court. Enron Canada moved to dismiss the claim asserting lack of personal jurisdiction and, in the alternative, that Reliant violated a 11 U.S.C. § 362(a) bankruptcy stay. The district court found that personal jurisdiction was not lacking, but agreed that the bankruptcy stay extended to the Enron Corporation also extended to its subsidiary, Enron Canada under the “unusual circumstances” exception articulated in A.H. Robins Co. v. Piccinin, 788 F.2d 994 (4th Cir.1986). The district court also found that the terms of the Netting Agreement imposed no liability on Enron Canada for the debts of other Enron entities and denied Reliant’s request for a preliminary injunction. For the following reasons, we conclude that the terms of the Netting Agreement are ambiguous, and therefore we vacate the district court’s decision and remand for further consideration.
BACKGROUND
The dispute arises from a history of trading between Reliant and five subsidiaries of the Enron Corporation. Reliant and Enron North America Corp. (“ENA”), Enron Broadband Services, L.P. (“EBA”), ENA Upstream Company, LLC (“ENA-UPSCOM”), Enron Canada, and Enron Power Marketing, Inc. (“EPMI”) (collectively, “Enron” or “Enron Parties”) executed and performed various master sales agreements that set forth the terms and conditions under which they traded, purchased and sold natural gas, electricity, and broadband data capacity (“underlying master agreements”). Each agreement was between a single Enron party and a single Reliant party and laid out the terms of their dealings in a single commodity or product.
Reliant and the various Enron subsidiaries performed under these underlying master agreements without incident for several years. In October 2001, however, news agencies began publishing reports that questioned the Enron Corporation’s accounting practices and the accuracy of their financial statements. At that time, the Enron Parties approached the Reliant Parties with the proposed Netting Agreement which effectively combined all of the existing underlying master agreements into “one single integrated agreement” governing payment, settlement, collateral, security interests, defaults and other terms.[1] On November 8, 2001, the Reliant *820 Parties and the Enron Parties executed the Netting Agreement.
The Netting Agreement provides that if one of the parties to an underlying master agreement defaulted on its obligations, the non-defaulting party could declare all of the underlying master agreements in default, otherwise referred to as cross-default. After giving all the parties notice of the default to the other parties, under section 2(b), the “Underlying Master Agreements Close-Out” provision of the Netting Agreement, the non-defaulting party has the right to take the following actions:
(i) accelerate, terminate, and liquidate, or otherwise close-out all Transactions under its Underlying Master Agreements as of such designated date; (ii) exercise rights of setoff, netting and/or recoupment in accordance with the terms of its Underlying Master Agreements; (iii) retain any Collateral; (iv) with respect to each Defaulting Party, withhold payment and performance of each Non-defaulting Party’s Obligations to each Defaulting Party to pay, secure, setoff against, net, and/or recoup such Defaulting Party’s Obligations to such Non-Defaulting Party; (v) convert any Obligation from one currency into another currency as set forth in Section 5; and (vi) take any other action permitted by law or in equity or by its Underlying Master Agreements or any Transactions thereunder necessary or appropriate to protect, preserve, or enforce its rights or to reduce any risk of loss or delay.
The exercise of the Section 2(b) right to close-out the transactions under the underlying master agreements results in a “Settlement Amount” for each underlying master agreement. The term “Settlement Amount” is defined as “the net amount that is due and payable by one Party to the other Party in respect of an Underlying Master Agreement upon the exercise by the Non-defaulting Party of the rights set forth in Section 2(b).” (emphasis added). The Netting Agreement provides that “ ‘Party’ means ENA, EPMI, EBS, ENAUPSCOM, ECC (Enron Canada), RES, and RESC as the context indicates, and ‘Parties’ means all of the foregoing.” Section 4 of the Netting Agreement provides for a netting or offsetting of the settlement amounts derived from each underlying master agreement to arrive at a final settlement amount that is payable by the group from whom such payment is due. Moreover, it sets forth the procedure by which the final settlement amount is to be remitted.[2]
On November 30, 2001, Reliant issued notice to the Enron parties, pursuant to Section 2 of the Netting Agreement that EPMI was in default on the Master Power Purchase and Sale Agreement, an underlying master agreement; and therefore, that all of the Enron Parties were in default *821 under the Netting Agreement. On December 2, 2001, the Enron Parties, except for Enron Canada, filed for Chapter 11 bankruptcy protection. Thereafter, these Enron Parties were protected from suit through the automatic stay provision of 11 U.S.C. § 362(a). After netting the settlement amount as required by Section 4, Reliant determined that the final settlement amount payable by the Enron Group to be $78,468,996.60.[3] On February 19, 2002, Reliant sent notice to EPMI through ENA stating that a “final settlement amount” was due, but that no funds were forthcoming. The very next day, Reliant sent a letter stating that “[njothing contained in the [February 19 letter] was intended to be, nor should be construed to have been a violation of 11 U.S.C. § 362(a),” the automatic stay provision of Chapter 11 bankruptcy protection.
On February 26, 2002, Reliant filed suit against Enron Canada, the only Enron party which had not filed for bankruptcy protection.[4] Reliant claimed that Enron Canada breached the Netting Agreement, seeking inter alia, injunctive relief and a declaration that Enron Canada was jointly liable for the $78,468,996.60 under the Netting Agreement. Enron Canada filed a motion to dismiss, arguing, among other things, that it was not subject to the court’s jurisdiction, that Reliant’s suit was subject to the automatic stay in bankruptcy, and that Enron Canada was not liable for the debts of its affiliates under the Netting Agreement. The district court dismissed Reliant’s suit, finding that it was subject to the automatic stay and that Enron Canada did not owe $78,468,996.60 to Reliant under the Netting Agreement.
DISCUSSION

Does the Netting Agreement impose joint liability upon the Enron parties?

The district court determined that generally the Netting Agreement does not impose an affirmative obligation on one party to cover all the debts of another. Thus, as part of its analysis of whether to extend the bankruptcy stay to Enron Canada, the district court determined that the Netting Agreement limits the forms of recovery to which Reliant is entitled. In particular, the district court determined that the language of the Netting Agreement unambiguously includes the right to terminate, liquidate, net, setoff, and apply collateral; and does not include the right to impose joint liability on Enron Canada.
We review the district court’s interpretation of the Master Netting Agreement de novo. A determination of whether a contract is ambiguous and the interpretation of a contract are questions of law, which on appeal are reviewed de novo. Stinnett v. Colorado Interstate Gas Co., 227 F.3d 247, 254 (5th Cir.2000). As this litigation involves the free trade of commodities with Canada, a free trade area country, federal jurisdiction is based on 28 U.S.C. § 2201; and therefore, federal law governs the interpretation of the Netting Agreement. See United States v. Taylor, 333 F.2d 633, 638 (5th Cir.1964) (“[I]t is clear that federal law will control contracts between private parties if there is sufficient federal interest.”).[5] A con *822 tract is ambiguous only if its meaning is susceptible to multiple interpretations. The mere fact that the parties may disagree on the meaning of a contractual provision is not enough to constitute ambiguity. When a contract is expressed in unambiguous language, its terms will be given their plain meaning and will be enforced as written. Certain Underwriters at Lloyd’s London v. C.A. Turner Constr. Co., 112 F.3d 184, 186 (5th Cir.1997). “When interpreting a contract, the question is what was the parties’ intent, [because] courts are compelled to give effect to the parties’ intentions.” Pennzoil Co. v. FERC, 645 F.2d 360, 388 (5th Cir.1981). To determine intent, we look to the plain language of the contract, its commercial context, and its purposes. Id.', see also, Transnat’l Learning Cmty at Galveston, Inc. v. United States Office of Pers. Mgmt, 220 F.3d 427, 431 (5th Cir.2000) (“[A] contract should be interpreted as to give meaning to all of its terms — presuming that every provision was intended to accomplish some purpose and that none are deemed superfluous.”).
Both Reliant and Enron Canada argue that the Netting Agreement is unambiguous in their respective favors. Reliant asserts that use of the term “Group” in Section 4 of the Netting Agreement — “the Final Settlement Amount shall be payable by the Group from whom such payment is due” — imposes liability on Enron Canada because it is part of the Enron Group. Reliant also makes several arguments that the Netting Agreement imposes joint liability on Enron Canada. Enron Canada asserts that Section 4 embodies only two functions, neither of which imply joint liability. First, it obligates payment from the original group from whom the money was due consistent with the applicable underlying master agreement. Second, it creates a mechanism for calculating the final settlement amount against that particular party after setoff. The primary difference between the two interpretations is that Enron Canada contends that the Netting Agreement only entitles Reliant to set off the amount they owe to Enron against the amount owed to them in order to calculate the final settlement amount; while, Reliant believes that they are entitled to not only set off the amounts, but also to choose from whom they wish to collect. Though both parties argue that the contract unambiguously compels a finding in their favor, we disagree and find that the contract is ambiguous as to whether it imposes joint liability on the various Enron Parties.
If a contract imposes joint liability on several parties then all joint obligors are bound for the whole performance of the contract. This is the consistent view of the various treatises on contract law and the Restatement (Second) of Contracts which is the law of this Circuit as well.[6] See Restatement (Second) of Contracts 2d §§ 288-89; see also DeLeon v. Lloyd’s London, Certain Underwriters, 259 F.3d *823 844 (5th Cir.2001) (citing Pitman). As a general rule, an obligation entered into by more than one person is presumed to be joint. Williston on Contracts, § 36:8 at 621 (4th ed. 1999).
This presumption will not be overcome unless there are either (1) express words to render the obligation several or joint and several (often referred to as “words of severance”); (2) the terms of the promise considered in the light of the surrounding circumstances indicate an intention to be bound severally, or jointly and severally; or (3) there is a statute that declares that every contract, though joint in its terms, is to be considered several as well as joint.
Id. at 621-23. The Restatement (Second) of Contracts 2d § 288 similarly provides: Promises of the Same Performance
(1) Where two or more parties to a contract make a promise or promises to the same promisee, the manifested intention of the parties determines whether they promise that the same performance or separate performances shall be given.
(2) Unless a contrary intention is manifested, a promise by two or more promi-sors is a promise that the same performance shall be given.
Restatement (Second) of Contracts 2d § 288 (1981). Also under § 289, if promi-sors have entered a contract jointly then they are each bound for the whole performance. However, determining what parties are obligated under a multi-party, multi-promise agreement is much more complicated. Indeed, as Corbin on Contracts instructs, “[i]t must be borne in mind that two or more persons may, by a single instrument containing only one promissory expression, bind themselves to pay wholly separate sums of money or to render any other entirely distinct performances.” 9 Corbin on Contracts § 937 at 685 (interim ed. 2002). Corbin goes on to explain that parties may subscribe separate amounts but that this may come down to merely how a contract is interpreted. Id. at 685-86.
As no statute exists to displace the joint obligations, this Court must determine whether the Netting Agreement imposes several or joint obligations upon the Enron parties looking to the contract for (1) express words which might render the obligations several or joint and several, or (2) whether the terms of the promise considered in the light of the surrounding circumstances indicate an intention to be bound severally, or jointly and severally. The sentence of Section 4 which is underlined in footnote 2 supra is of critical importance in this regard. This sentence is an express covenant for payment of the amount of the Final Settlement Amount at a date certain by “the Group from whom such payment is due.” This covenant of payment is separate and distinct from all of the other covenants between the parties; and is in our view the ultimate purpose of the Netting Agreement. The Netting Agreement states that the term “ ‘Group’ means Enron Group or Counter-party Group, as applicable.” The Netting Agreement defines “Enron Group” to mean “all Enron Parties.” Moreover, the Netting Agreement defines “Enron Party” as meaning “any of ENA, EPMI, EBS, ENAUPSCOM, and ECC (Enron Canada).”
If the term “all Enron Parties” is inserted in place of the word “Group” in the critical sentence of Section 4 of the contract, it would read: “The Final Settlement Amount shall be payable by all Enron Parties from whom such payment is due on the third business day after such statement.” The words “from whom such payment is due” would modify “all Enron Parties” which would seem to indicate that the particular party that owes money is *824 obligated to pay. Under this reading, the plain language of the Netting Agreement would impose no liability on Enron Canada to pay the final settlement owed to Reliant as a result of EPMI’s default under the Master Power Purchase and Sale Agreement. Such a reading could indicate that the language of Section 4 is intended to sever the obligation of each party to pay debts accrued under all of the underlying master agreements. See Alexander v. Wheeler, 64 A.D.2d 837, 407 N.Y.S.2d 319, 320 (N.Y.App.Div.1978) (explaining that under New York law, words of severance are necessary to overcome a presumption of joint obligations). The difficulty with this reading, however, is that it renders the determination of the Final Settlement Amount meaningless, for that amount is itself clearly a sum resulting from offsetting all of the various amounts owed between the Enron Parties and Counter-parties (Reliant) on the underlying master sales agreements. In other words, it makes little sense for the parties to calculate a Final Settlement Amount if that amount cannot be collected from any entity. Furthermore, this reading would negate the purpose of the cross-default right, found in Section 2(b), and the cross-collateral rights, found in Section 6 and Annex A, which the Netting Agreement clearly contemplates for the benefit of the Non-Defaulting Party.
However, the terms of Section 4 may also be reasonably read another way. The phrase “from whom such payment is due” could be read as modifying the word “Group” and the word “Group” means “Enron Group or Counter Party Group, as applicable.” The phrase “from whom such payment is due,” therefore, permits us to determine which of the two meanings of the word “Group” is “applicable.” There is no dispute that the “Final Settlement Amount” was properly determined in accordance with the language of the Netting Agreement and the net balance owed was from the Enron Group to the Counter Party Group, (Reliant). Consequently, once used for this purpose the phrase “from whom such payment is due” would be surplusage and the relevant sentence could be interpreted as reading: “the Final Settlement Amount shall be payable by all Enron Parties on the third business day after the statement is provided.” Under this interpretation of the contract language, “all Enron Parties” would be jointly liable to pay the final settlement amount. This raises the question, however, that if this was the intended meaning, why did the parties not repeat using the term “Defaulting Group” instead of “Group” in Section 4 and omit the phrase “from whom such payment is due” all together. A possible explanation is that until the Final Settlement Amount is actually determined as of the point in time when the right to close out all of the underlying agreements has been exercised, there is no way to predict whether the Defaulting Party will owe money to the Non-Defaulting Party, or vice versa. Therefore, the parties used the phrase “by the Group from whom such payment is due” to cover either eventuality. Adding additional confusion to this issue is the fact that the Netting Agreement makes no mention anywhere else amongst its provisions that the obligations are being entered into jointly as to payment of the Final Settlement Amount.
Viewing the Master Netting Agreement as a whole adds no further illumination on the subject. The Netting Agreement purports to incorporate all of the underlying agreements between the various parties, but the only underlying agreement in the record on appeal is the Master Power Purchase & Sale Agreement between Reliant and EPMI; and that underlying agreement, creates no rights to collect amounts owed from anyone but the parties involved in that particular contract. Though the parties agree that the Netting Agreement *825 creates the right to set-off amounts owed between the different Enron and Reliant parties, this does not necessarily mean that the Final Settlement Amount can be collected from any party unless that party is otherwise jointly and severally liable. In short, nothing in the Netting Agreement expressly states the parties’ intentions as to whether the Final Settlement Amount is or is not a joint obligation of the members of the “group from whom such payment is due.” As such, we find that the Netting Agreement is ambiguous as to this point and particularly with respect to Section 4 and the meaning of the term “Group.” The district court did not make a finding as to the intentions of the parties as it apparently felt the contract was unambiguous in favor of Enron Canada and granted summary judgment in Enron’s favor. We disagree and find that the Netting Agreement is ambiguous and therefore remand this case to the district court to make a factual determination as to the intentions of the parties and, in particular, to determine the parties’ intended meaning of the term “Group” in Section 4.

Does the bankruptcy stay extend to Enron Canada?

The district court also granted Enron Canada’s motion to dismiss based on the bankruptcy stay in place for the other Enron entities. The district court based this decision, in part on A.H. Robins Co. v. Piccinin, 788 F.2d 994 (4th Cir.1986), and found that the present case constituted the type of unusual circumstances that should extend a bankruptcy stay. Reliant claims that this case was an inappropriate extension of the bankruptcy stay provisions and that the Fifth Circuit has never adopted the reasoning of AH. Robins Co.
This Court reviews the scope of an automatic stay de novo. Kosadnar v. Metropolitan Life Ins. Co., 157 F.3d 1011, 1013 (5th Cir.1998). The purposes of the bankruptcy stay under 11 U.S.C. § 362 “are to protect the debtor’s assets, provide temporary relief from creditors, and further equity of distribution among the creditors by forestalling a race to the courthouse.” GATX Aircraft Corp. v. M/V Courtney Leigh, 768 F.2d 711, 716 (5th Cir.1985). “By its terms the automatic stay applies only to the debtor, not to co-debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code nor to co-tortfea-sors.” Id. This Court has also noted that “[sjeetion 362 is rarely, however, a valid basis on which to stay actions against non-debtors.” Arnold v. Garlock, Inc. 278 F.3d 426, 436 (5th Cir.2001). However, an exception to this general rule does exist, and a bankruptcy court may invoke § 362 to stay proceedings against nonbankrupt co-defendants where “there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.” A.H. Robins Co., 788 F.2d at 999. This Court recognized the AH. Robins Co.’s exception in Arnold, but declined to extend it in that case because no claim of a formal tie or contractual indemnification had been made to create an identity of interests between the debtor and nondebtor. 278 F.3d at 436. Also, in Edwards v. Armstrong World Industries, this Court refused to extend the AH. Robins exception to a surety, holding that a supersedeas bond may be executed against the surety of a judgment debtor. 6 F.3d 312, 316-17 (5th Cir.1993), reversed on other grounds, 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995).
Though the district court found that the exception should extend to Enron Canada in this case, its order was premised largely on its finding that Enron Canada was not obligated under the contract to pay for the debts of the other Enron *826 parties. The district court’s conclusion that the Netting Agreement does not impose joint liability upon the different Enron Parties was actually a part of its analysis as to whether or not the bankruptcy stay should extend to Enron Canada. As the district court premised its decision on its interpretation of the Netting Agreement, and as we have held that the Netting Agreement is ambiguous, we vacate the district court’s decision to extend the bankruptcy stay, and remand to the district court to reconsider this issue in light of its findings as to the meaning of the Netting Agreement. Should the district court find that the Netting Agreement imposes no obligation upon Enron Canada to cover the debts of the other Enron parties, then the bankruptcy stay issue will become moot. If, however, the district court finds that a joint obligation is imposed by the Netting Agreement, then it will have to revisit this issue in light of that new finding.
CONCLUSION
As we find that the Netting Agreement between Reliant and Enron is ambiguous as to its language regarding whether the Enron parties are jointly liable, we REVERSE the district court’s grant of summary judgment and REMAND the case to the district court. On remand, the district court is to determine the intentions of the parties’ as to liability under the contract, and, in particular, to determine the parties’ intended meaning of the term “Group” in Section 4. As the district court’s denial of Reliant’s request for a preliminary injunction appears to have been based on its dismissal of the case on its merits, we REVERSE the district court’s decision on this issue as well so that, on remand, the district court may determine whether Reliant has established the necessary elements to entitle it to a preliminary injunction.[7] As the district court relied upon its conclusion that the Netting Agreement imposes no joint obligations upon the various Enron parties in its decision to extend the bankruptcy stay, and as we have remanded the case on that issue, we also VACATE the district court’s decision in this regard and REMAND for further proceedings consistent with this opinion. We do not comment, therefore, on whether the 11 U.S.C. § 362(a) bankruptcy stay extends to Enron Canada.
VACATED, in part, and REVERSED and REMANDED.

. Although the Netting Agreement refers to at least six underlying master agreements, the record contains only one, the Master Power *820 Purchase & Sale Agreement, an underlying master agreement between Reliant and EPMI.

. Section 4 provides in relevant part as follows:
Upon Non-defaulting Group's exercise of the Underlying Master Agreements CloseOut, the Settlement Amounts under the Underlying Master Agreements shall be netted and reduced by the exercise of rights to apply Collateral pursuant to all rights granted in this Agreement (as so netted and reduced, the "Final Settlement Amount”). Upon determination of the Final Settlement Amount, Non-defaulting Group shall provide Defaulting Group with a statement showing the calculation of the Final Settlement Amount. The Final Settlement Amount shall be payable by the Group from whom such payment is due on the third Business Day after the statement is provided. In the event of a dispute as to the Final Settlement Amount payable by a Group, such Group shall, within the time prescribed herein, pay the undisputed amount of the Final Settlement Amount without delay. If the Parties are unable to resolve the disputed amount of the Final Settlement Amount within 10 days, the matter shall be submitted to arbitration in accordance with Section 16. (underlining added)

. Reliant reached this $78,486,996.60 amount by subtracting the amounts that Reliant owed different Enron Parties from the total deficit. Prior to netting, Reliant Canada owed Enron Canada in excess of $4,000,000.

. Reliant filed suit only as the domestic entity of Reliant Energy Services, Inc., thus avoiding any potential subject matter jurisdiction problems due to lack of diversity. Federal jurisdiction, however, arises from 28 U.S.C. § 2201.

.Although under Section 9 of the Netting Agreement, the parties agreed that the contract shall be governed by and construed in *822 accordance with the laws of the State of New York, there is sufficient federal interest such that federal law governs the interpretation of this contract.

. This also appears to be the law in Texas, the location of the district court where the case was heard, and the law in New York, which is the state whose laws were contractually agreed upon to apply to the contract. See Pitman v. Lightfoot, 937 S.W.2d 496, 528 (Tex.Civ.App.—San Antonio 1996 writ denied); In re Moss, 249 B.R. 411, 420 (Bankr.N.D.Tex.2000); Manufacturers & Traders Trust Co. v. Lindauer, 135 Misc.2d 132, 513 N.Y.S.2d 629, 634 (N.Y.Sup.Ct.1987) (quoting Williston on Contracts); see also Holland v. Fahnestock & Co., Inc., 210 F.R.D. 487, 502 (S.D.N.Y.2002) (stating that ‘‘[(Inherent in the concept of joint and several liability is the right of a plaintiff to satisfy its whole judgment by execution against any one of the multiple defendants who are liable to him.”).

. "A preliminary injunction is an extraordinary equitable remedy that may be granted only if the plaintiff establishes four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the mov-ant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest.” Hoover v. Morales, 164 F.3d 221, 224 (5th Cir.1998).