**OXY USA, INC., Appellant,**

v.

**SOUTHWESTERN ENERGY PRODUCTION COMPANY, Appellee.**

No. 13–03–00075–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

April 14, 2005.

Rehearing Overruled May 19, 2005.

Amy Douthitt Maddux, Karla Ann Evans, Philip J. John, Jr., Baker Botts, L.L.P., Houston, for appellant.

Jeff Weems, Houston, for appellee.

Before Justices HINOJOSA, YAÑEZ, and GARZA.

## OPINION

Opinion by Justice HINOJOSA.

This case involves an indemnity agreement between two major oil and gas companies. After both parties filed motions for summary judgment, the trial court granted the motion of appellee, Southwestern Energy Production Company ("SEPCO") and denied the motion of appellant, OXY USA, Inc. ("OXY"). In four issues, OXY contends the trial court erred in granting SEPCO's motion for summary judgment and in denying its motion for summary judgment. We reverse and render.

### A. BACKGROUND AND PROCEDURAL HISTORY

On June 5, 1997, OXY and SEPCO entered into a Seismic and Exploration Agreement ("SEA"), effective March 27, 1997, to conduct seismic surveys on an area of land referred to as the "Bouré project." The SEA provided that: (1) OXY and SEPCO would equally share costs for the acquisition and development of three-dimensional seismic data; (2) OXY would receive fifty percent of the rights in seismic agreements and oil and gas leases relating to the project; and (3) OXY and SEPCO would each receive a license to the seismic data acquired. The SEA further provided that OXY and SEPCO would mutually approve the selection of a contractor to process the seismic data.

Unbeknownst to OXY, SEPCO had previously entered into a letter agreement ("Skelly Letter Agreement") with Skelly Exploration Company, owned by Denny Whinery (collectively "Skelly"), a consultant to SEPCO. The letter agreement, dated December 16, 1996, provided that SEPCO and Skelly would jointly market a three-dimensional seismic program for the Bouré project. SEPCO would receive a twenty-five percent working interest in all permits, options, leases and data processing, as well as a standard license to the resulting seismic data. Any additional promoted interest or promoted cash would be owned and retained by Skelly.

Also unknown to OXY, on April 29, 1997, SEPCO entered into an agreement ("Seitel Agreement") with a seismic contractor, Seitel Data Limited ("Seitel"), which provided, in part, that SEPCO would purchase four nonexclusive licenses to the Bouré project seismic data. OXY and Skelly were each designated as recipients of a license.

Shortly after OXY and SEPCO entered into the SEA, SEPCO's parent company, Southwestern Energy Company, conducted an internal investigation of SEPCO. After the investigation, all of SEPCO's senior management were either terminated or resigned. During the investigation, Southwestern Energy discovered inconsistencies between the SEA and the Seitel Agreement. Upon investigation, Southwestern Energy concluded that OXY was unaware of both the Skelly Letter Agreement and the Seitel Agreement.

Following disclosure of the inconsistent agreements, OXY informed SEPCO that because SEPCO had breached the SEA, OXY would not proceed under the agreement unless Skelly was removed from the project. OXY also voiced concerns regarding potential claims by Skelly if the deal were renegotiated to eliminate Skelly's participation. In response to OXY's concerns, SEPCO offered to indemnify OXY against any claims relating to the Bouré project.

On October 16, 1997, SEPCO, OXY, and Seitel entered into a new agreement ("New Bouré Agreement"). Under this agreement, OXY and SEPCO agreed to each contribute twenty-five percent of the costs of the seismic shoot; in return, each company would receive one of four licenses to the data and a fifty percent interest in the Bouré project. SEPCO and OXY would jointly designate the recipients of the two remaining licenses. Skelly was not named as a recipient of a license. On December 11, 1997, SEPCO and OXY entered into a Joint Prosecution and Indemnification Agreement ("Indemnity Agreement") in order to alleviate OXY's concern that Skelly might claim an interest in the Bouré project.

Before entering into the Indemnity Agreement, SEPCO filed suit in federal court on October 31, 1997, against Whinery, Skelly, and others, including former employees of SEPCO, for fraud and violations of the Racketeer Influenced and Corrupt Organizations Act.[1] On June 23, 1998, Skelly counterclaimed against SEPCO for breach of contract, defamation, and tortious interference with prospective economic gain. On June 16, 1999, SEPCO settled the lawsuit with Skelly and executed a mutual release of claims relating to the Bouré project. The release failed to include OXY.

Skelly subsequently sued OXY, alleging tortious interference with contract, conversion, and abuse of rights. By letter dated November 16, 1999, OXY notified SEPCO that it had been sued by Skelly, and requested that SEPCO defend and indemnify OXY in accordance with the Indemnity Agreement. SEPCO responded, without reservation of rights, that it would defend OXY. SEPCO assumed payment for OXY's selected defense counsel, and provided OXY with access to SEPCO's own local outside counsel. However, on the eve of trial, on June 16, 2000, SEPCO asserted it was not obligated to indemnify OXY under the Indemnity Agreement. OXY settled the lawsuit with Skelly for $2.5 million plus a license to the seismic data. SEPCO contributed $400,000 and the license.

After settling with Skelly, OXY filed suit against SEPCO, alleging breach of con-

---

1. *See* 18 U.S.C. § 1961, *et seq.*

tract and fraudulent inducement. SEPCO counterclaimed for a declaratory judgment that the Indemnity Agreement did not cover the claims asserted by Skelly, and, in the alternative, that the Indemnity Agreement was unenforceable. SEPCO later added a counterclaim for fraud, alleging that it agreed to defend OXY without knowing that on April 27, 1998, OXY had conveyed most of its interest in the Bouré project to Petro–Hunt, L.L.C., but had reserved its rights under the Indemnity Agreement.

Both parties filed motions for partial summary judgment. The trial court denied OXY's motion and granted SEPCO's motion on the grounds that the Indemnity Agreement was unenforceable under Texas law and that OXY did not have a right to receive indemnity from SEPCO based on Skelly's claims. The trial court later severed the contract claims from the remaining claims, making the summary judgment final.

## B. Standard of Review

We review the granting of a motion for summary judgment de novo. See Natividad v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex.1994); Tex. Commerce Bank–Rio Grande Valley v. Correa, 28 S.W.3d 723, 726 (Tex.App.-Corpus Christi 2000, pet. denied). For summary judgment to be proper, the evidence must establish as a matter of law that there is no genuine issue of material fact as to any of the essential elements of the plaintiff's cause of action, or that the defendant has conclusively established all elements of an affirmative defense. Walker v. Harris, 924 S.W.2d 375, 377 (Tex.1996); Crain v. Smith, 22 S.W.3d 58, 59 (Tex.App.-Corpus Christi 2000, no pet.). In deciding whether to sustain a summary judgment, we accept all evidence favorable to the non-movant as true, and make all reasonable inferences and resolve all doubts in the non-movant's favor. Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex.1997). When both parties move for summary judgment, and one motion is granted and the other is denied, we must rule on all questions presented by the motions and render such judgment as the trial court should have rendered. Comm'rs Court of Titus County v. Agan, 940 S.W.2d 77, 81 (Tex.1997); Jones v. Strauss, 745 S.W.2d 898, 900 (Tex.1988) (orig.proceeding) (per curiam).

## C. Enforceability of the Indemnity Agreement

In its first issue, OXY contends the trial court erred in granting SEPCO's motion for summary judgment and in denying its motion for summary judgment because the Indemnity Agreement is enforceable as a matter of law. SEPCO contends the Indemnity Agreement does not satisfy the fair notice requirements promulgated by the supreme court. In the alternative, SEPCO asserts that the Indemnity Agreement does not provide indemnity for intentional tort claims.

### 1. Applicability of Fair Notice Requirements

Because indemnity agreements involve "an extraordinary shifting of risk" from the exculpated party to the indemnitor, the Texas Supreme Court has developed the fair notice requirements of express negligence and conspicuousness. Dresser Indus., Inc. v. Page Petroleum, Inc., 853 S.W.2d 505, 508 (Tex.1993). The express negligence requirement provides that when a party is seeking indemnity from the consequences of that party's own future negligence, that intent must be expressed in unambiguous terms within the four corners of the contract. Ethyl Corp. v. Daniel Constr. Co., 725 S.W.2d 705, 708

(Tex.1987). The conspicuousness requirement provides that something must appear on the face of the contract indicating the intent to transfer liability so that it will attract the attention of a reasonable person when he looks at it. *Dresser Indus.*, 853 S.W.2d at 508. Whether an indemnity clause complies with these fair notice requirements is a question of law for the court. *Id.* at 509–10.

■ The fair notice requirements apply to indemnity agreements when "the effect ... is to relieve a party *in advance* of responsibility for its own negligence." Id. at 507 (emphasis added); *see also Solis v. Evins*, 951 S.W.2d 44, 50 (Tex.App.-Corpus Christi 1997) (orig.proceeding) (noting that a party may not "prospectively contractually exculpate itself with respect to intentional torts"). However, the fair notice requirements have not been applied to exculpatory agreements utilized by parties *after* the transaction or occurrence takes place. *Dresser Indus.*, 853 S.W.2d at 508 n. 1 ("Today's opinion applies the fair notice requirements to indemnity agreements and releases only when such exculpatory agreements are utilized to relieve a party of liability for its own negligence in advance."). The application of the fair notice requirements has been "explicitly limited to releases and indemnity clauses in which one party exculpates itself from its own future negligence." *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 387 (Tex.1997) (citing *Dresser Indus.*, 853 S.W.2d at 507 & n. 1); *see Lehmann v. Har–Con Corp.*, 76 S.W.3d 555, 560 (Tex.App.-Houston [14th Dist.]

2002, no pet.) (holding that express negligence did not apply to release executed after acts giving rise to released liability had occurred); *Lexington Ins. Co. v. W.M. Kellogg Co.*, 976 S.W.2d 807, 809 (Tex. App–Houston [1st Dist.] 1998, pet. denied) (holding that fair notice did not apply when release was executed "after the acts that could give rise to liability were completed").[2]

■ In asking us to hold that the Indemnity Agreement is unenforceable as a matter of law for failure to comply with the fair notice requirements, SEPCO asks us to extend the reach of "fair notice" to cover indemnity agreements that are used to shift liability for actions that have already occurred. In the absence of an extraordinary shifting of risk, the supreme court has "resisted expanding the fair notice requirements." *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 193 (Tex. 2004). The supreme court has noted that in adopting the fair notice requirements, it was "concerned with the injustice arising when a contracting party buries a provision substantially releasing itself from its own negligence in a way that is inconspicuous and does not provide fair notice to the other party." *Green Int'l*, 951 S.W.2d at 387 (discussing *Dresser Indus.*, 853 S.W.2d at 508). The supreme court's concerns are not present here. The Indemnity Agreement was executed by two major oil and gas companies with equal bargaining power after negotiations that specifically contemplated the adoption of an agreement releasing OXY from liability. Both parties were fully aware of the risk-shifting nature

---

**2.** We note that while *Lehmann v. Har–Con Corp.*, 76 S.W.3d 555 (Tex.App.-Houston [14th Dist.] 2002, no pet.) and *Lexington Ins. Co. v. W.M. Kellogg Co.*, 976 S.W.2d 807 (Tex.App–Houston [1st Dist.] 1998, pet. denied) concern releases, the supreme court has clarified that because releases and indemnity clauses both operate to transfer risk, the policy considerations underlying them are similar enough to warrant the application of the fair notice requirements to indemnity agreements as well. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508–09 (Tex.1993). Thus, authorities discussing the policy and applicability of the fair notice requirements to releases are applicable to indemnity clauses.

of the agreement and limited it in scope to liability arising from a specific series of transactions that had already occurred. We decline to extend the fair notice requirements.

### 2. *Accrual of Claims*

■ SEPCO also contends that not all of Skelly's claims arose from acts that occurred prior to the execution of the Indemnity Agreement. Specifically, SEPCO asserts that the claim for conversion did not arise until Seitel completed the seismic survey and distributed the licenses, which occurred after the Indemnity Agreement was signed. In their suit against OXY, the Skelly plaintiffs claimed they "owned an interest and/or were entitled to possession of such data through a license pursuant to the Seitel Agreement" and that "OXY unlawfully ... exercised dominion over the 3–D seismic data to the exclusion of/or inconsistent with the rights of plaintiffs."

■ SEPCO argues that the contractual grant of a license in the Seitel Agreement was merely an intangible right, and therefore, could not be the basis of the conversion claim. However, Texas recognizes conversion of intangible property where the underlying intangible right has been merged into a document and that document has been converted. *Express One Int'l, Inc. v. Steinbeck,* 53 S.W.3d 895, 901(Tex.App.-Dallas 2001, no pet.) (citing *Neles–Jamesbury, Inc. v. Bill's Valves,* 974 F.Supp. 979, 982 (S.D.Tex.1997)). Skelly's right to a license was not merely an intangible right, but was a right merged into the Seitel Agreement. Without deciding the merits of Skelly's conversion claim, we conclude that the claim arose when the New Bouré Agreement changed the rights that had been granted in the Seitel Agreement. Thus, the claim for conversion arose on October 16, 1997, when OXY, SEPCO, and Seitel executed the New Bouré Agreement. Because all claims against OXY arose from actions that occurred prior to the execution of the indemnification agreement, we conclude the fair notice requirements do not apply.

### 3. *Intentional Torts*

In the alternative, SEPCO contends that because the Indemnity Agreement does not clearly and specifically state that SEPCO indemnifies OXY for intentional torts, the contract was not intended to cover, and should not be interpreted to cover, intentional torts.

■ If there is no ambiguity, the construction of a contract is a question of law to be determined by the court. *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968). We construe indemnity contracts under the normal rules of contract construction, with the primary goal of determining the intent of the parties. *Assoc. Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 284 (Tex.1998); *ABB Kraftwerke Aktiengesellschaft v. Brownsville Barge & Crane,* 115 S.W.3d 287, 291 (Tex.App.-Corpus Christi 2003, pet. denied). It is the objective, not subjective, intent of the parties that controls, and the instrument alone is generally deemed to express that intent. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981) (citing *City of Pinehurst,* 432 S.W.2d at 518).

■ It is generally presumed that the parties to an instrument "intend every clause to have some effect and in some measure to evidence their agreement." *City of Pinehurst,* 432 S.W.2d at 518. Provisions are to be read in the context of the instrument as a whole, not in isolation. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 216 (Tex.2003); *United Am. Ins. Co. v. Selby,* 161 Tex. 162, 338 S.W.2d 160, 164 (1960); *New Braun-*

*fels Factory Outlet Ctr. v. IHOP Realty Corp.*, 872 S.W.2d 303, 309 (Tex.App.-Austin 1994, no pet.). Only when we consider all parts of the contract together can we give it the meaning that will carry out and effectuate the intention of the parties to the fullest extent. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995); *City of Pinehurst*, 432 S.W.2d at 519; *Smith v. Liddell*, 367 S.W.2d 662, 665–66 (Tex.1963).

■ We agree with the parties that the contract is unambiguous. At issue is whether the parties intended to limit the Indemnity Agreement to cover only specific causes of action. The Indemnity Agreement provides, in relevant part, as follows:

WHEREAS, SEPCO and OXY have previously entered into a certain Seismic and Exploration Agreement ... concerning the Bouré project ... for good and valuable consideration.

WHEREAS, certain individuals and companies, including former SEPCO employees, who performed services related to ... the Bouré project, have allegedly engaged in certain misconduct which may have increased the cost of these projects and exposed the projects to potential adverse claims by third parties.

❖ ❖ ❖ ❖ ❖ ❖

SEPCO and OXY agree that they share a common interest in the prosecution of [claims against Skelly] and in the defense of any resulting counterclaims. SEPCO and OXY will fully cooperate with each other in the prosecution and/or defense of these claims whether or not OXY is a party to currently pending litigation or any future related litigation.

❖ ❖ ❖ ❖ ❖ ❖

SEPCO agrees to defend, indemnify, and hold harmless OXY ... from and

against all costs, expenses, claims, demands, lawsuits, court costs, attorney's fees, and judgments directly resulting from claims brought by or in favor of any individual or entity ... claiming or purporting to claim any interest through or derived from SEPCO in those instruments defined as Seismic Agreements in the Seismic and Exploration Agreement, or in the Seismic Exploration Agreement itself, as well as all other agreements acquired by either party, subsequent to March 27, 1997.

■ The Indemnity Agreement does not expressly limit, nor does it specifically enumerate, the types of claims to which it applies. The traditional maxim *"expressio unius est exclusio alterius,"* the expression of one thing is the exclusion of another, when applied as a rule of construction, instructs that "the expression in a contract of one or more things of a class implies the exclusion of all not expressed, even though all would have been implied had none been expressed." *First Nat'l Bank v. Nugent*, 384 S.W.2d 224, 226 (Tex.App.-San Antonio 1964, writ ref'd n.r.e.) (quoting 17A C.J.S. Contracts, § 312); *see CKB & Assoc., Inc. v. Moore McCormack Petroleum, Inc.*, 734 S.W.2d 653, 655–56 (Tex.1987); *Wilson v. Klein*, 715 S.W.2d 814, 820 (Tex.App.-Austin 1986, writ ref'd n.r.e.). The maxim is instructive: had OXY and SEPCO expressly mentioned specific types of claims that were covered by the indemnity clause, any claim not mentioned would be excluded by implication. However, because no specific types of claims are mentioned, and there is no language indicating that limitations were intended, we presume the Indemnity Agreement applies to all claims. Thus, under general rules of contract construction, intentional torts are included in the Indemnity Agreement.

Despite this, SEPCO argues that OXY cannot indemnify itself against liability for

intentional torts because it did not clearly and expressly mention intentional torts in the Indemnity Agreement. However, SEPCO cites no case mandating such a requirement.[3] While the parties could have included a provision limiting indemnity to specific types of claims, or specifically excepting intentional torts from coverage, they did not. We will not rewrite the agreement to "insert provisions [that the] parties could have included or to imply restraints for which they have not bargained." *Tenneco, Inc. v. Enter. Prod. Co.*, 925 S.W.2d 640, 646 (Tex.1996) (citing *Dorroh–Kelly Mercantile Co. v. Orient Ins. Co.*, 104 Tex. 199, 135 S.W. 1165 (Tex. 1911)). Accordingly, we conclude that the Indemnity Agreement applies to intentional tort claims. OXY's first issue is sustained.

## D. PUBLIC POLICY

In its second issue, OXY asserts that the Indemnity Agreement does not violate Texas public policy. SEPCO argues that any agreement indemnifying a party for its own intentional torts is unenforceable as against Texas public policy.

While the supreme court has noted that indemnity against one's own intentional torts does raise public policy concerns, it has not held that such indemnity agreements are prohibited. *Atl. Richfield Co. v. Petroleum Pers., Inc.*, 768 S.W.2d 724, 726 n. 2 (Tex.1989). In cases where a party has contracted to indemnify itself against its own future negligence, the supreme court has held that it does not violate public policy, *Allright, Inc. v. Elledge*, 515 S.W.2d 266, 267 (Tex.1974); *Ohio Oil Co.*

*v. Smith,* 365 S.W.2d 621, 624 (Tex.1963), except where there is a disparity of bargaining power such that one party is so disadvantaged that it is essentially forced to agree to the exculpatory provision. *Allright, Inc.*, 515 S.W.2d at 267 (holding that parking lot owner did not have sufficiently dominant relationship over vehicle owners for public policy to prevent enforcement of agreement limiting liability); *Crowell v. Hous. Auth. of Dallas,* 495 S.W.2d 887, 889 (Tex.1973) (holding it to be contrary to public policy for housing authority to exempt itself from liability to its own tenants); *Valero Energy Corp. v. M.W. Kellogg Constr. Co.*, 866 S.W.2d 252, 256 (Tex. App.-Corpus Christi 1993, pet. denied) (holding that enforcement of indemnity provision for gross negligence does not offend public policy when parties are sophisticated entities bargaining from positions of substantially equal strength).

SEPCO argues that because intentional torts have a higher culpable mental state than negligence claims, the shifting of liability evokes greater risk to the indemnitor and a greater public policy concern. SEPCO encourages us to consider insurance industry cases, which have held that a party cannot insure itself against its own intentional torts under the public policy rationale that "an insured is more likely to engage in behavior which is harmful to society if he believes he will not have to bear the financial costs of his intentional indiscretions." *Wessinger v. Fire Ins. Exch.,* 949 S.W.2d 834, 840 (Tex.App.-Dallas 1997, no writ). SEPCO argues that allowing a party to indemnify itself against

---

**3.** The cases on which SEPCO relies for the proposition that intentional torts must be clearly and expressly stated in order to be covered, *see, e.g., Houston Lighting & Power Co. v. Atchison, Topeka & Santa Fe Ry.*, 890 S.W.2d 455, 458 (Tex.1994); *Gulf Coast Masonry, Inc. v. Owens–Illinois, Inc.*, 739 S.W.2d 239, 239 (Tex.1987); *Webb v. Lawson–Avila Constr.*, 911 S.W.2d 457, 460 (Tex.App.-San Antonio 1995, writ dism'd), all involve application of the fair notice requirements. Because we have determined that fair notice does not apply here, we conclude these cases are not instructive.

an intentional tort would allow it to create harm or injury to others with no risk of liability. We find SEPCO's argument unconvincing in these circumstances.

We find the public policy argument of deterring misconduct by preventing a party from contracting away liability to be inapplicable in this case because the Indemnity Agreement is limited to actions that have already occurred. The public policy goal is especially inapplicable because the Indemnity Agreement acknowledges that part of the rationale underlying its adoption lies in the misconduct of the indemnitor. After acknowledging that SEPCO's own misconduct exposed the Bouré project, and all parties involved, to litigation, SEPCO agreed to indemnify OXY against any potential claims stemming from OXY's continued participation, in order to secure that participation. Public policy would not be served by allowing SEPCO to induce OXY to forgo a breach of contract claim and renegotiate based upon a promise of indemnity, and then disavow that indemnity. OXY would not be exposed to any liability were it not for the initial misconduct of SEPCO.

We conclude that public policy does not prohibit the enforcement of the Indemnity Agreement between SEPCO and OXY. OXY's second issue is sustained.

### E. Claims Covered

 In its third issue, OXY contends that Skelly's claims against it are covered by the Indemnity Agreement. SEPCO argues that Skelly's claims are not based on interests derived through or from SEPCO in any agreement covered by the Indemnity Agreement.

In the Indemnity Agreement, SEPCO agreed to indemnify OXY against "all costs, expenses, claims, demands, lawsuits, ... and judgments resulting from claims brought by ... any individual or entity

[not a part of the indemnity agreement] claiming ... any interest through or derived from SEPCO in" (1) the instruments defined in the SEA as "Seismic Agreements," (2) the SEA itself, and (3) all other agreements acquired by either party subsequent to March 27, 1997. The SEA defines "Seismic Agreements" as "oil, gas and mineral leases or subleases; permits and/or options to acquire oil, gas, and mineral leases from the owners of the land; and/or mineral rights or mineral leases under the AMI, any of which permit the conducting of a seismic survey program as described in Article V hereof."

In its amended pleading, Skelly included claims against OXY for (1) tortious interference with contractual and business relations, (2) conversion, and (3) abuse of rights. Skelly's claims stem from asserted contractual interests in both the Skelly Letter Agreement and the Seitel Agreement, and an ownership or possessory interest in the three-dimensional seismic data through a license under the Seitel Agreement. In deciding whether Skelly's claims are covered by the Indemnity Agreement, we must determine whether each of these interests constitutes "interest[s] through or derived from SEPCO" as those terms were intended by the parties to the contract.

#### 1. The Skelly Letter Agreement

The Skelly Letter Agreement is a letter agreement dated December 16, 1996, between Skelly and SEPCO. The agreement notes that Skelly had generated a three-dimensional seismic area of mutual interest, and provided that SEPCO and Skelly would jointly market the three-dimensional seismic program for the Bouré project. SEPCO would receive a twenty-five percent carried interest in all permits, options, leases, data processing and a standard license to one hundred percent of the

seismic data; with any additional promoted interest or promoted cash to be owned and retained by Skelly.

SEPCO contends that the Skelly Letter Agreement is not a "Seismic Agreement." However, SEPCO fails to state a basis for that contention. We conclude that the Skelly Letter Agreement anticipates the conducting of a seismic survey program and the division of permits, options, and leases acquired in relation to that survey. Accordingly, we hold it is a "Seismic Agreement," as that term was defined in the SEA.

Prior to the Skelly Letter Agreement, SEPCO had contracted and obtained permission to conduct seismic surveys in the area later to become the Bouré project.[4] In the Skelly Letter Agreement, SEPCO agreed to bring Skelly into the project to acquire and market the seismic data. Thus, Skelly's interests as defined in the Skelly Letter Agreement were "interest[s] through or derived from SEPCO."

Because the Skelly Letter Agreement is considered a "Seismic Agreement" in accordance with the Indemnity Agreement, and confers an interest to Skelly through SEPCO, we hold that Skelly's claims based on rights stemming from the Skelly Letter Agreement are covered by the indemnity contract between SEPCO and OXY.

### 2. *The Seitel Agreement*

 SEPCO contends that Skelly's right to receive a license under the Seitel Agreement is not derived from SEPCO, but is an independent claim not covered by the Indemnity Agreement. The Seitel Agreement is an April 29, 1997 letter agreement between SEPCO and Seitel,

confirming certain details of the parties' participation in the Bouré project.

The Seitel Agreement required SEPCO to purchase up to four licenses to the seismic data. In the agreement, SEPCO designated Skelly as the recipient of one of the licenses. Skelly's ownership/possessory interest in the three-dimensional seismic data was based on this license. Skelly only had a right to acquire this license because SEPCO contracted to purchase a license for the benefit of Skelly. Thus, Skelly's right to a license to the seismic data under the Seitel Agreement is an "interest through or derived from SEPCO." Further, because the Seitel Agreement constitutes "an agreement acquired subsequent to March 27, 1997," Skelly's claims based on rights stemming from the Seitel Agreement are covered by the indemnity contract between SEPCO and OXY.

We hold that all claims brought against OXY by Skelly directly result from a claimed interest derived from or through SEPCO and are, therefore, covered by the Indemnity Agreement. OXY's third issue is sustained.

### F. OXY's Assignment of Bouré Interests

In its fourth issue, OXY contends that when it assigned its interests in the Bouré project to Petro–Hunt, L.L.C., it specifically reserved its rights under the Indemnity Agreement. In April 1998, OXY executed a Conveyance and Assumption Agreement, conveying to Petro–Hunt, L.L.C., certain assets, including OXY's rights and interests in the SEA and in a September 8, 1997 agreement between OXY and Seitel. SEPCO asserts that because at the time of the assignment there was no judgment or

---

4. The SEA states that SEPCO had "previously acquired contractual rights to conduct a seismic survey(s) ...," and had previously entered into "certain Seismic Agreement [sic]

with landowners ... which ... include[d] the right to conduct seismic surveys on the lands described...."

settlement against OXY, there was only a potential cause of action and no existing right to indemnity to be reserved.

The rights reserved by OXY are much broader than SEPCO asserts. OXY specifically excepted and reserved "all rights relating to ... existing claims and causes of action ..., including without limitation rights under that certain Joint Prosecution and Indemnification Agreement...." At the time of the assignment, all of the operative facts giving rise to the eventual suit against OXY had occurred. The right to indemnity is a right relating to those existing claims. We conclude that OXY retained its right to be indemnified under the Indemnity Agreement. OXY's fourth issue is sustained.

### G. Conclusion

We reverse the orders of the trial court granting SEPCO's motion for summary judgment and denying OXY's motion for summary judgment. Because we hold that the Indemnity Agreement is enforceable against SEPCO and covers all claims in question, we render judgment denying SEPCO's motion for summary judgment and granting OXY's motion for summary judgment.