IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 14, 2008

Charles R. Fulbruge III
Clerk

No. 06-20624

A2D TECHNOLOGIES INC; RILEY ELECTRIC LOG INC

Plaintiffs-Appellants

v.

MJ SYSTEMS INC; PETROFICHE INC, doing business as MJ Systems Inc

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:05-CV-1750

Before HIGGINBOTHAM, WIENER, and PRADO, Circuit Judges.

PER CURIAM:[*]

The case before us regards allegations of the unauthorized use of a trademark and similar state law claims brought by two data vendors in the well log industry against two of their competitors. In its ruling on the defendants' motion to dismiss, the district court held that a settlement agreement signed by the parties in 1984 barred the current trademark claims and limited the plaintiffs to a breach of contract action. The plaintiffs have appealed this ruling, as well as the district court's limitation on discovery. For the following reasons,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

we REVERSE and REMAND for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

A.    The Well Log Industry

Plaintiffs and Defendants are competing data vendors in the well log industry.[1]  A well log is a document produced by an oil and gas company that records the data obtained when the company drills a well in search of oil and gas deposits.  These logs are typically nine inches wide and may be over thirty feet long, making them somewhat unwieldy.  They are valuable to other companies who may choose to later explore the same area.  To that end, data vendors collect images of the logs that are filed publicly pursuant to state laws and also those in private hands.[2]  The vendors then reproduce the logs for sale to interested companies.

B.    Riley & A2D

According to the first amended complaint, Plaintiff-Appellant Riley Electric Log, Inc. ("Riley") has been engaged in the business of collecting, enhancing, and selling copies of well logs since 1948.  Riley collects these logs from both public and private sources.  Riley also expends resources to enhance the paper logs by improving their readability and reducing them to a smaller format known in the industry as "half-scale" or "Riley-scale."  During the enhancement process, Riley puts its name and logo on the log ("Riley's mark").

---

[1]  In reviewing a decision made on a motion to dismiss, we are limited to the allegations contained in the pleadings and documents attached to the pleadings.  See Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2000).  While some of the background facts we set forth regarding the well log industry are not included in the pleadings, we mention them here, as did the parties in their briefing, to aid in a better understanding of the well log industry and how vendors in that industry operate.  Our analysis of this case is not affected by the inclusion of these non-material facts.

[2]  Most states, including Texas, require that well logs be filed publicly.

Riley asserts that the Riley's mark is registered with the United States Patent and Trademark Office and is also a protected trademark at common law. Riley states that consumers associate the Riley's mark with a particular quality of well logs and that Riley has sought to protect its reputation by preventing others from using or copying its mark. For example, when Riley sells a log with a Riley's mark on it to a customer, it is done with the understanding that the customer will not make the log available for redistribution.

In 2003, Plaintiff-Appellant A2D Technologies, Inc. ("A2D") acquired Riley, and Riley became a wholly owned subsidiary of A2D. A2D uses the internet, as well as digital images of well logs, to provide services to its customers.

## C. M.J. Systems & Petrofiche

Defendant-Appellee M.J. Systems, Inc. ("M.J. Systems") is also a well log vendor. M.J. Systems films or scans paper well logs, but it does not enhance them in any way. M.J. Systems then converts the filmed logs into a microfiche format or an electronic raster image[3] and maintains the images in its log library. M.J. Systems reproduces the archived microfiche and raster images for its customers on demand.

Defendant-Appellee Petrofiche, Inc. ("Petrofiche") does business as M.J. Systems. Although the exact relationship between the two entities is unclear, no party draws any material distinction between the two Defendants.

## D. The 1983 Lawsuit and 1984 Settlement Agreement

In 1983, Riley filed suit against M.J. Systems in the Western District of Oklahoma. In that suit, Riley alleged that M.J. Systems was reproducing and distributing images of well logs with the Riley's mark on them.[4] Riley alleged

---

[3] A raster image is a type of digital image and includes file formats such as GIF, JPEG, TIFF, BMP, PICT, and PCX.

[4] Although not stated by the parties, we can infer that either some of the well logs with the Riley's mark on them were filed publicly, which allowed M.J. Systems to scan them, or some of Riley's customers permitted M.J. Systems to film their privately held logs.

that the microfiche copies were of a different and inferior quality than Riley's copies. The litigation ended in 1984 when the parties signed a Settlement Agreement ("the Agreement").

Pursuant to the Agreement, M.J. Systems agreed to pay $12,000 to Riley and to use certain "best efforts" to prevent Riley's marks from appearing on M.J. Systems' logs in the future. The portion of the Agreement regarding M.J. Systems' best efforts states as follows:

> 2. M.J. agrees to use the following best efforts in preventing any of RILEY'S MARKS from appearing on any product made or caused to be made by or on behalf of M.J. from and after the date first above written.
>
>> a. If the creation of a product by or on behalf of M.J. includes the use of any paper well log containing a header located at the beginning of the log and in which a RILEY'S MARK appears (such type of log being hereinafter referred to as a "RILEY'S LOG"), M.J. agrees to delete or otherwise mask or mark out, to the extent possible, such header so that such header does not appear in the M.J. product . . . .

Paragraph 3 describes the course M.J. Systems is to take should the owner of a well log object to any permanent mark M.J. Systems may need to make on the well log in order to mask or mark out the Riley's mark. For its part, Riley agrees in Paragraph 4 to use its best efforts to remove its stickers and labels from public copies of well logs.

The Agreement also provides that Riley and M.J. Systems will release certain claims against each other:

> 6. RILEY hereby releases M.J. from all claims arising prior to the date first above written and asserted by RILEY against M.J. in the aforementioned lawsuit.
>
> 7. M.J. hereby releases RILEY from all claims arising prior to the date first above written and asserted by M.J. against RILEY in the aforementioned lawsuit.

Finally, the Agreement contains a notice and cure provision in the event either party defaults on its obligations:

> 8. In the event that M.J. fails to make the payments as are specified in paragraph 1, RILEY shall provide 15 days notice to cure. If a payment is not made within said 15 days, RILEY shall have the option to either terminate this Agreement or sue for specific performance. Should any other default occur by either party to this Agreement, the nondefaulting party shall provide a 15 day right to cure to the defaulting party. Should cure not occur with [sic] said 15 days, the non-defaulting party shall be entitled to:
>
> > a. sue for specific performance pursuant to this Agreement, or
>
> > b. give notice that its obligations to perform are abated until the default is cured.

The question before us today is whether this Agreement prohibits Plaintiffs from bringing trademark and similar state law claims against Defendants for alleged trademark violations that occurred after the Agreement was signed.[5]

## II. PROCEDURAL HISTORY

The parties performed under the Agreement without incident for over twenty years. Then, on May 16, 2005, A2D filed the instant suit against M.J. Systems and Petrofiche (collectively, "Defendants") in the Southern District of Texas, claiming that M.J. Systems "continues to reproduce and distribute inferior copies of Riley logs . . . ." A2D filed its first amended complaint on August 4, 2005, prior to serving its original complaint on Defendants, and added Riley as a plaintiff. The first amended complaint contains allegations of trademark infringement under the Lanham Act, 15 U.S.C. § 1114; passing off under the Lanham Act, 15 U.S.C. § 1125; dilution and injury to business reputation, TEX. BUS. & COM. CODE ANN. § 16.29 (Vernon 2002 & Supp. 2006); unfair competition under Texas common law; tortious interference with a

---

[5] A2D and Petrofiche, although not signatories to the Agreement, concede that they are bound by the terms of the Agreement.

contract under Texas common law; misappropriation; and breach of contract. Although the causes of action are various, the alleged conduct—unauthorized reproduction and distribution of Riley logs—remains the same.

Defendants filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on September 9, 2005, on the ground that the Agreement barred all of Plaintiffs' causes of action except for the breach of contract claim. The district court agreed, and on February 13, 2006, it issued on order holding that the Agreement precluded Plaintiffs from bringing any claims other than for breach of contract. The district court, therefore, dismissed all of Plaintiffs' causes of action other than the breach of contract claim.[6] The district court further held that the Agreement prohibited Plaintiffs from pursuing through discovery Defendants' well log inventory to see if any potential violations of the Agreement existed. Instead, the district court limited the suit to those alleged trademark violations that were already known.

Following the district court's ruling, Plaintiffs filed their second amended complaint, which included more specific allegations regarding their breach of contract claim. The parties then filed an agreed motion for entry of judgment on the breach of contract claim, which the district court granted on June 16, 2006. Plaintiffs now appeal the district court's order on the motion to dismiss, both as to the dismissal of their trademark and state law claims, as well as the discovery ruling. We have jurisdiction over this appeal, as a final judgment has been entered. See 28 U.S.C. § 1291.

## III. STANDARD OF REVIEW

We review the grant of a motion to dismiss under Rule 12(b)(6) de novo, taking all the facts alleged in the complaint as true. Kennedy v. Chase

---

[6] Defendants had also argued that the breach of contract claim was not properly pleaded; however, the district court granted Plaintiffs an opportunity to correctly plead their claim.

Manhattan Bank USA, N.A., 369 F.3d 833, 839 (5th Cir. 2004). We must construe the complaint in the light most favorable to Plaintiffs and draw all reasonable inferences in Plaintiffs' favor. See Lovick v. Ritemoney, Ltd., 378 F.3d 433, 437 (5th Cir. 2004); see also Priester v. Lowndes County, 354 F.3d 414, 418 (5th Cir. 2004) (noting that motions to dismiss are viewed with disfavor and rarely granted). To survive a Rule 12(b)(6) motion to dismiss, Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." See Bell Atl. Corp. v. Twombly, –U.S.–, 127 S. Ct. 1955, 1974 (2007). Dismissal may be appropriate on the basis of a successful affirmative defense if that defense appears on the face of the complaint. EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, N.A., 467 F.3d 466, 470 (5th Cir. 2006). Although we typically may not consider materials or documents outside of the complaint in addressing a motion to dismiss, we may consider documents attached to the complaint, such as the Agreement in this case. See Kennedy, 369 F.3d at 839.

With respect to Plaintiffs' argument that the district court erred in limiting discovery, we apply an abuse of discretion standard. See Wiwa v. Royal Dutch Petroleum Co., 392 F.3d 812, 817 (5th Cir. 2004). We will affirm the district court's discovery ruling unless it is "arbitrary or clearly unreasonable." Id. (internal quotation marks omitted).

## IV. DISCUSSION

The district court in this case dismissed Plaintiffs' trademark claims and similar state law claims after concluding that those claims were "subsumed" in the Agreement, leaving Plaintiffs with only a breach of contract action. Plaintiffs contend on appeal that this decision was erroneous because the Agreement did not release any post-settlement trademark or trademark-related claims. Plaintiffs further argue that to construe the Agreement as the district court did violates the intentions of the parties and the goal of the Agreement. Defendants contend that the district court properly interpreted the Agreement

and that Plaintiffs released their trademark and state law claims by signing the Agreement.

A.    Contract Construction Principles

The district court based its decision on its interpretation of the Agreement. We review the interpretation of a contract de novo, as it involves a legal question. Empire Fire & Marine Ins. Co. v. Brantley Trucking, Inc., 220 F.3d 679, 681 (5th Cir. 2000).[7]

In construing a contract, such as the Agreement, our goal is to give effect to the intentions of the parties. Reliant Energy Servs., Inc. v. Enron Can. Corp., 349 F.3d 816, 822 (5th Cir. 2003); Seagull Energy E & P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 345 (Tex. 2006). To that end, we look first to the language of the Agreement. See Reliant Energy, 349 F.3d at 822; SAS Inst., Inc. v. Breitenfeld, 167 S.W.3d 840, 841 (Tex. 2005) (per curiam). "When a contract is expressed in unambiguous language, its terms will be given their plain meaning and will be enforced as written." Reliant Energy, 349 F.3d at 822; see also SAS Inst., 167 S.W.3d at 841. A contract is ambiguous, and thus not subject to interpretation as a matter of law, only if the language is susceptible to two or more reasonable interpretations. See Reliant Energy, 349 F.3d at 821-22; Seagull Energy, 207 S.W.3d at 345. In determining ambiguity, we examine the entire contract in order to harmonize and give effect to all of its provisions so that none are rendered meaningless. Seagull Energy, 207 S.W.3d at 345; see also Transitional Learning Cmty. at Galveston, Inc. v. U.S. Office of Pers. Mgmt., 220 F.3d 427, 431 (5th Cir. 2000) ("[A] contract should be interpreted as to give

---

[7] The parties use both federal and Texas state law to interpret the Agreement. See Williams v. Phillips Petroleum Co., 23 F.3d 930, 935 (5th Cir. 1994) (stating that the release of federal claims is covered by federal law). As discussed herein, federal law and Texas law are essentially identical for purposes of interpreting the Agreement in this case.

meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.").

With respect to the release of claims, Texas law provides that "any claims not clearly within the subject matter of the release are not discharged." Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 938 (Tex. 1991). To be effective, the release must "mention" the claim being released. Id. "It is not necessary, however, for the parties to anticipate and explicitly identify every potential cause of action relating to the subject matter of the release." Stafford v. Allstate Life Ins. Co., 175 S.W.3d 537, 541 (Tex. App.—Texarkana 2005, no pet.).

## B.    Application to the Agreement

As recognized by the parties, Paragraph 6 of the Agreement contains the only explicit release of claims by Plaintiffs. Pursuant to Paragraph 6, Riley released "all claims arising prior to the date first above written and asserted by RILEY against M.J. in the aforementioned lawsuit." Thus, to be released under the terms of the Agreement, a claim must (1) arise prior to the Agreement, and (2) have been asserted in the 1983 lawsuit. The claims in this case arose after the Agreement was signed and were not included in the 1983 lawsuit. Consequently, there is no explicit release of the present claims contained in the Agreement, which militates in favor of the conclusion that the Agreement does not release the instant claims. See Victoria Bank, 811 S.W.2d at 938 (stating that claims not clearly within the release are not discharged).

Further, the principle of expressio unius est exclusio alterius counsels us that "the expression in a contract of one or more things of a class implies the exclusion of all not expressed, even though all would have been implied had none been expressed." Oxy USA, Inc. v. Sw. Energy Prod. Co., 161 S.W.3d 277, 285 (Tex. App.—Corpus Christi 2005, pet. denied) (internal quotation marks omitted). Therefore, the Agreement's specific inclusion of past claims in the

release and its silence regarding future claims indicates that the parties did not intend to release future claims.

Regardless, Defendants argue that the Agreement, when read as a whole, releases all of the trademark and trademark-related claims in this case. Defendants base this interpretation primarily on Paragraphs 2 and 8 of the Agreement. According to Defendants, because Paragraph 2 requires them to use their "best efforts" with respect to "any product" they produce and Paragraph 8 creates a limited remedy for defaults, the Agreement was clearly intended "to create a mechanism to guide future conduct, resolve future disputes, and limit potential future remedies to just two options."

Turning first to Paragraph 2, we note that it does require Defendants to use "the following best efforts" to prevent a Riley's mark from appearing on "any product" made by Defendants. The Agreement then describes what "the following best efforts" entail. Pursuant to those paragraphs, Defendants must mask or mark out the Riley's mark if Defendants' product "includes the use of any paper well log . . . ." The products at issue in the current lawsuit are the reproduction of electronic or microfiche images that are already stored in Defendants' log library.[8] The allegedly infringing products, thus, do not "include[] the use of any paper well log." Consequently, no action is required by Defendants under the Agreement with respect to Defendants' reproduction of images. Therefore, the reproduction of images with the Riley's mark does not result in a default under the Agreement, and we are left with an action that is not prohibited by the Agreement, but arguably not allowed under trademark law and state law. Essentially, then, Defendants read the Agreement as permitting

---

[8] To the extent Plaintiffs' claims include allegations that Defendants are continuing to make initial scans of paper well logs without masking or marking out the Riley's mark, Plaintiffs do not appear to contest that such claims are subject to the limited remedies of Paragraph 8.

the alleged infringements by virtue of not creating a remedy for such actions or explicitly prohibiting them.

Defendants err by interpreting the Agreement's failure to create a "best efforts" solution for the reproduction of images as permission to continue to use the Riley's mark in the reproduction of images from their log library. Although decided pursuant to Louisiana law, we find this court's opinion in Brennan's, Inc. v. Dickie Brennan & Co., 376 F.3d 356 (5th Cir. 2004), instructive on this point. In Brennan's, feuding relatives in the restaurant industry signed a consent-to-use agreement regarding the Brennan's name. Id. at 359-60. Brennan's then sued Dickie Brennan for trademark violations when Dickie Brennan allegedly used the Brennan's name in ways not permitted by the agreement. Id. at 360. Dickie Brennan argued that the existence of the agreement barred any trademark claims. Id. at 364-67. We disagreed.

In reaching our decision, we framed the question as "whether the agreement bars Brennan's from pursuing a trademark case for uses outside of those contemplated and permitted by the agreement." Id. at 366-67. We concluded that

> By its terms, the language of the agreement does not preclude such a suit, for it provides only that Brennan's "shall not object . . . so long as" Dickie follows the contract's guidelines. The contract does not say that Brennan's has relinquished the right to pursue trademark remedies for uses that are not permitted by the agreement. . . . The agreement accordingly cannot be taken to mean that Brennan's has implicitly given up its preexisting right to pursue trademark claims as to unauthorized uses. Put differently, the fact that Brennan's permitted Dickie to engage in certain specified uses without fear of liability does not mean that Dickie is thereby immunized from trademark liability for all unauthorized uses.

Id. at 367.

11

The same holds true in this case. The fact that the Agreement created a "best efforts" standard for certain uses of the Riley's mark does not eliminate any rights Plaintiffs may have for uses of the Riley's mark that are not permitted, or even addressed, by the Agreement.

Brennan's is admittedly distinguishable from the instant suit in that, in this case, the parties agreed to certain limited remedies in the Agreement. However, the limited remedies apply only in the event of a default. Because Defendants' alleged actions are not prohibited by the Agreement, Defendants' conduct is not a default, and the limited remedies provision is inapplicable. Consequently, even when read as a whole, the Agreement does not waive Plaintiffs' future trademark claims against Defendants for conduct not addressed by the Agreement.

Defendants argue that such an interpretation violates the goal of the Agreement to fix a past problem and create a manner and means for resolving future disputes. While it is true that the Agreement was intended to resolve the 1983 litigation and create some standards for conduct going forward, the Agreement simply does not contain the language necessary to have the drastic effect of waiving all future trademark claims. See Reliant Energy, 349 F.3d at 822 (stating that courts must look to the plain language of a contract to determine the parties' intentions). These are sophisticated parties who were represented by counsel at the time the Agreement was signed. It is not reasonable that they would agree to release all future claims only by strained implication, and the district court erred in concluding otherwise. Therefore, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

C.    Limitation on Discovery

Plaintiffs also contend that the district court erred when it determined that the Agreement prohibited Plaintiffs from pursuing, through discovery,

12

Defendants' well log inventory to see if any violations of the Agreement existed. The district court based this decision on its conclusion that "the language of the Agreement does not envision either party exploring the well log inventory of the other party in pursuit of potential violations." While we offer no opinion on whether Plaintiffs are entitled to the discovery they seek, we do agree with Plaintiffs that the district court's legal reasoning was erroneous, and therefore we reverse its decision on this point.

The question of whether a party is entitled to discovery is not determined solely by reference to any preexisting agreements between the parties. Instead, the question is answered by reference to the applicable Federal Rules of Civil Procedure and case law on point. See, e.g., FED. R. CIV. P. 26(b). Therefore, by denying discovery based solely on the fact that there was no preexisting agreement between the parties that would permit discovery, the district court erred. On remand, the district court should reexamine the issue with reference to the Rules and pertinent case law.

## V. CONCLUSION

Because the district court erred by concluding that the Agreement releases all of Plaintiffs' causes of action other than for breach of contract and that the Agreement alone prohibits certain discovery, we REVERSE and REMAND for further proceedings consistent with this opinion.

REVERSED and REMANDED.